IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| L.B., individually and on behalf of D.B. a minor,<br><br>                    Plaintiffs,<br><br>vs.<br><br>UNITED STATES OF AMERICA, BUREAU OF INDIAN AFFAIRS, and DANA BULLCOMING, an agent of the Bureau of Indian Affairs sued in his individual capacity,<br><br>                    Defendants. | CV 18-74-BLG-SPW-TJC<br><br><br>**FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE** |

Plaintiff L.B. filed this action on April 23, 2018 against the United States of America, Bureau of Indian Affairs (BIA), and BIA agent Dana Bullcoming (Bullcoming), in his individual capacity.  (Doc. 1.)  Bullcoming was personally served with the summons and complaint on September 20, 2018.  (Doc. 14-2.) Bullcoming did not answer or otherwise respond to the complaint, and the Clerk of Court entered his default on October 17, 2018.  (Doc. 18.)

L.B. and the United States subsequently filed cross-motions for summary judgment.  L.B. alleged that she was injured as a result of the wrongful acts of Bullcoming, which were committed within the scope of his employment with the United States as a BIA law enforcement officer.  L.B. thus asserted that the United

States was liable for her injuries and damages under the Federal Tort Claims Act (FTCA).  The United States countered that Bullcoming was not acting within the scope of his employment with the BIA, and therefore the United States was not liable under the FTCA.  The Court agreed with the United States, and summary judgment was entered in its favor on August 28, 2019.  (Doc. 64.)

The Court subsequently held a hearing on L.B.'s motion for entry of default judgment as to her claims against Bullcoming.  The Court heard testimony from L.B., economist Ann Adair, Ph.D, and social worker Rebecca Burns Weston, LCSW.  L.B. filed a post-hearing default judgment memorandum summarizing her legal claims and elements of damages.  (Doc. 80.)  For the following reasons, the Court recommends that a default judgment be entered in favor of L.B. and against Bullcoming, and that damages be awarded in the amount of $1,611,854.

## I.    BACKGROUND

After the entry of default, the factual allegations of the complaint are accepted as true, except those relating to the amount of damages.  *Geddes v. United Financial Group,* 559 F.2d 557, 560 (9th Cir. 1977).  Consequently, the following facts are taken from L.B.'s complaint.  (Doc. 1.)

L.B. was a resident of Lame Deer, Montana, which is located on the Northern Cheyenne Indian Reservation.  (*Id.* at ¶ 1.)  On October 31, 2015, L.B. reported to law enforcement that her mother was driving while intoxicated.

2

Bullcoming responded to the call in his capacity as a BIA law enforcement officer. After finding L.B.'s mother safe, he went to L.B.'s residence.  (*Id.* at ¶ 2.)

Bullcoming entered L.B's residence without her consent, and found her sleeping on a living room sofa.  (*Id.* at ¶ 3.)  L.B. awoke to find Bullcoming standing over her.  (*Id.*)  Bullcoming asked L.B. if she were alone, and she responded that her children were asleep in another room.  (*Id.* at ¶ 4.)  Bullcoming then told L.B. that he would need to call social services and arrest L.B. for child endangerment, because she was intoxicated while in the presence of her children. (*Id.* at ¶ 5.)  L.B. told Bullcoming that she had started a new job and she would lose the job if she were arrested.  (*Id.* at ¶ 6.)  Nevertheless, Bullcoming placed L.B. in custody and had her take a breathalyzer, which tested low.  (*Id.* at ¶ 7.)

While she was in his custody, Bullcoming told L.B. that "something had to be done."  (*Id.* at ¶ 8.)  L.B. asked Bullcoming if he meant "sex," and he replied yes.  Bullcoming then proceeded to have unprotected sex with L.B. without her consent and left the residence.  (*Id.* at ¶ 9.)  L.B. became pregnant as a result of the encounter, and gave birth to a child, D.B.

Bullcoming was subsequently charged in Federal District Court with violating 18 U.S.C. § 242,[1] deprivation of rights under color of law.  (*Id.* at ¶ 11.)

---

[1]  L.B. incorrectly cites 42 U.S.C. § 1983 in her complaint as the offense of conviction.  Bullcoming was charged under 18 U.S.C. § 242.  (*United States v. Bullcoming*, CR 17-89-BLG-SPW, Doc. 1 (D. Mont.).)  The Court can take

Bullcoming pled guilty to the charge.  (*Id.* at ¶ 12.)  In pleading guilty, Bullcoming acknowledged that while acting under color of law, he coerced L.B. into engaging in sexual intercourse with him under threat of arrest if she refused.  (*Id.* at ¶ 11; see also *United States v. Bullcoming*, CR 17-89-BLG-SPW, Doc. 16 at 3 (D. Mont.).) He also acknowledged that he deprived L.B. of her right not to be deprived of liberty without due process of law.  (*Id.*)

In this action, L.B. asserts claims against Bullcoming in his individual capacity, and lumps several causes of action together under a single count in the complaint.  It is alleged that Bullcoming's conduct violated L.B.'s rights under the Montana and United States Constitutions, and constituted multiple intentional torts under Montana law, including (1) false arrest and false imprisonment, (2) sexual assault and battery, (3) abuse of process, (4) negligent infliction of emotional distress, and (5) intentional infliction of emotional distress.  (*Id.* at ¶ 15.)

## II.   JURISDICTION

L.B. does not specifically allege the grounds for federal jurisdiction in her complaint.  Nevertheless, she alleges that her claims are brought under the FTCA and 42 U.S.C. § 1983, each of which could give rise to federal jurisdiction.

---

judicial notice of its own docket.  *EduMoz, LLC v. Republic of Mozambique*, 698 F.Supp.2d 1041, 1049 (C.D. Cal. 2013).

The FTCA contains an exclusive grant of jurisdiction in federal courts for claims against the United States for torts committed by government employees acting in the course and scope of their employment.  28 U.S.C. § 1346(b).  If the Court had jurisdiction under the FTCA, it could also exercise supplemental jurisdiction over L.B.'s related state tort claims under 28 U.S.C. § 1367(a).  As discussed above, however, the Court has determined that L.B.'s claims do not fall within the FTCA's grant of jurisdiction and waiver of sovereign immunity.  If a federal claim is dismissed for lack of subject matter jurisdiction, supplemental jurisdiction may not be exercised over the remaining non-federal claims under 28 U.S.C. § 1367.  *Herman Family Revocable Tr. v. Teddy Bear*, 254 F.3d 802, 806 (9th Cir. 2001) ("If the district court dismisses all federal claims on the merits, it has discretion under § 1367(c) to adjudicate the remaining claims; if the court dismisses for lack of subject matter jurisdiction, it has no discretion and must dismiss all claims.").  See also, *Estate of Harshman v. Jackson Hole Mountain Resort Corp.*, 379 F.3d 1161, 1167-68 (10th Cir. 2004) (dismissal of FTCA claim for lack of jurisdiction deprived district court of supplemental jurisdiction over state law claims).

The Court may also exercise jurisdiction over claims brought pursuant to 42 U.S.C. § 1983, and its jurisdictional counterpart, 28 U.S.C. § 1343(a)(3).  But while L.B. cites 42 U.S.C. § 1983 as a basis for liability in the complaint,

Bullcoming is not subject to liability under § 1983.  To be subject to a § 1983

claim, the defendant must act under "color of state law."  As a federal BIA officer,

Bullcoming was acting under color of federal law, not state law.  *Johnson v. United*

*States*, 642 F. Supp. 2d 1, 4 (D.D.C. 2009) ("§ 1983 only applies to state actors; it

does not apply to federal officials acting purely under the color of federal law.").

But Bullcoming is liable for violating the constitutional rights of another while

acting under federal law, pursuant to the authority of *Bivens v. Six Unknown Fed.*

*Narcotics Agents*, 403 U.S. 388, 391 (1971).  *Bivens* recognized a damages remedy

to compensate persons injured by federal officers who violate the Fourth

Amendment's prohibition against unreasonable searches and seizures, invoking the

general federal question jurisdiction of the federal courts.  *Butz v. Economou*, 438

U.S. 478, 486 (1978).  As the Ninth Circuit has recognized "[a]ctions under § 1983

and those under Bivens are identical save for the replacement of a state actor under

§ 1983 by a federal actor under Bivens." *Van Strum v. Lawn*, 940 F.2d 406, 409

(9th Cir.1991).

The fact that L.B. incorrectly cites § 1983 is not fatal to federal jurisdiction

or her claim.  Whether a suit arises under the laws of the United States must be

determined from the plaintiff's complaint, but the lack of proper reference to

federal law is not controlling.  *N. Am. Phillips v. Emery Air Freight Corp.*, 579

F.2d 229, 233 (2d Cir. 1978).  See also, *Johnson v. City of Shelby, Miss,* 574 U.S.

10, 11 (2014) (complaint stated claim despite "imperfect statement of the legal theory supporting the claim asserted."); *Alvarez v. Hill*, 518 F.3d 1152, 1157 (9th Cir. 2008) (complaint does not need to identify the statutory or constitutional source of the claim raised).

Therefore, the Court has jurisdiction of L.B.'s *Bivens* claim under its general federal question jurisdiction, 28 U.S.C. § 1331.  It may exercise supplemental jurisdiction of L.B.'s state tort claims under 28 U.S.C. § 1367(a).

## III.   DISCUSSION

### A.   Entry of Default Judgment

The entry of default judgment against a party is governed by Fed. R. Civ. P. 55(b).  If the claim is for a "sum certain or a sum that can be made certain by computation" the clerk must enter judgment for that amount against the defaulting party.  Fed. R. Civ. P. 55(b)(1).  In all other cases, the party must apply to the court for a default judgment.  Fed. R. Civ. P. 55(b)(2).

The decision to grant default judgment under Fed. R. Civ. P. 55(b)(2) is left to the court's discretion.  *Albade v. Albade,* 616 F.2d 1089, 1092 (9th Cir. 1980). In deciding whether default judgment is appropriate, the following factors may be considered: "(1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material

facts; (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits." *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986).

The first *Eitel* factor weighs in favor of default. Bullcoming was personally served with the complaint and has failed to appear. If the default judgment is not entered, L.B. "will likely be without other recourse or recovery." *PepsiCo, Inc. v. Cal. Sec. Cans.*, 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002). Therefore, prejudice to L.B. is clear.

The second and third factors are also met. L.B. sufficiently alleges facts which state a plausible claim for relief, as required by Fed. R. Civ. P. 8(a). First, she has sufficiently alleged a constitutional tort claim by alleging that Bullcoming was a federal BIA law enforcement officer; he was acting under color of law; and his actions violated L.B.'s right to be free from unreasonable search and seizure under the Fourth Amendment.

Her constitutional claim also has merit. The Supreme Court recently recognized the continued viability of a *Bivens* remedy in the search and seizure context. *Ziglar v. Abbasi*, 137 S.Ct. 1843, 1856-57 (2017). Bullcoming's conduct in coercing L.B. into sexual intercourse under the threat of arrest clearly constituted an unlawful seizure of her person. In fact, in pleading guilty to the

criminal charges against him, Bullcoming specifically admitted that he violated L.B.'s constitutional rights.

L.B. also states a valid claim for false imprisonment. Under Montana law, the essential elements of false imprisonment are the restraint of an individual against their will and the unlawfulness of the restraint. *Hughes v. Pullman*, 36 P.3d 339, 343 (Mont. 2001). Here, L.B. has alleged that Bullcoming placed L.B. into custody, and then coerced her into having sexual intercourse. That is plainly an unlawful restraint on L.B.'s liberty.

It is also clear that Bullcoming committed an unlawful battery. Under Montana law, "[a] person is liable to another for battery if (a) the person acts intending to cause a harmful or offensive contact with another, or an imminent apprehension of such a contact, and (b) a harmful contact directly or indirectly results." *Point Serv. Corp. v. Myers*, 125 P.3d 1107, 1112-13 (Mont. 2005). Bullcoming's rape of L.B. clearly satisfies these requirements.

In her complaint, L.B. also alleges that Bullcoming committed other intentional torts, including abuse of process and negligent and intentional infliction of emotional distress. But the damages recoverable under those torts would be duplicative of the damages recoverable under the claims discussed above, and the additional claims do not impact the analysis of the *Eitel* factors.

Under the fourth factor, the Court balances "the amount of money at stake in relation to the seriousness of the [defaulting party's] conduct." *PepsiCo*, 238 F. Supp. 2d at 1176; see *Eitel*, 782 F.2d at 1471-72. "This requires that the court assess whether the recovery sought is proportional to the harm caused by defendant's conduct." *Landstar Ranger Inc. v. Parth Enterprises, Inc.*, 725 F. Supp. 2d 916, 921 (C.D. Cal. 2010). The amount of damages recommended in this case are substantial. But the damages are proportionate to the seriousness of Bullcoming's conduct and the resulting harm. Bullcoming's actions constituted an abhorrent abuse of authority. Bullcoming used his power and authority as a federal law enforcement officer to rape a citizen he was duty-bound to protect. It is also reasonably proportionate to the harm caused. As discussed below, Bullcoming's conduct will have a substantial impact on L.B. for her lifetime.

As to the fifth factor, there is very little possibility of a dispute concerning material facts. As noted above, in pleading guilty to the criminal offense, Bullcoming admitted that he coerced L.B. into sexual intercourse under a threat of arrest if she refused and violated her constitutional rights in doing so.

Regarding the sixth factor, there has been no evidence presented to the Court which would indicate that Bullcoming's default is due to excusable neglect. He was served with a summons and complaint by the Pine County, Minnesota Sheriff's Office on September 20, 2018. He did not answer or otherwise appear,

10

and he has made no attempt to set aside his default since it was entered on October 17, 2018.

Finally, the seventh factor does not weigh against the entry of default judgment. Although cases should be decided on the merits whenever possible, "this preference, standing alone, is not dispositive." *PepsiCo,* 238 F. Supp. 2d at 1177. Fed. R. Civ. P. 55(b) allows the court to enter a default judgment if a defendant fails to appear and defend. A "[d]efendant's failure to answer plaintiff's complaint makes a decision on the merits impractical, if not impossible." *PepsiCo,* 238 F. Supp. 2d at 1177. Here, Bullcoming's failure to appear and defend makes a decision on the merits impossible. The federal rules provide for the entry of default judgment in these circumstances.

Therefore, after consideration of the *Eitel* factors, the Court finds that the entry of default judgment is appropriate.

### B.    Damages

The Court must determine the amount of damages which will reasonably compensate L.B. for the harm caused by Bullcoming's conduct. The damages recoverable for Bullcoming's intentional torts of false imprisonment and battery are governed by Montana law. In Montana, "the measure of damages for a tort is the amount which will compensate for all the detriment proximately caused by the tort, whether it could have been anticipated or not." *Castillo v. Franks*, 690 P.2d

11

425, 429 (Mont. 1984) (citing Mont. Code Ann. § 27-1-317).  This includes

damages for physical pain and suffering, *Oberson v. U.S.*, 311 F. Supp. 2d 917 (D.

Mont. 2004); mental and emotional pain and suffering and distress, *Seltzer v.

Morton*, 154 P.3d 561 (Mont. 2007); the reasonable value of necessary care,

treatment and services, *Johnson v. U.S.*, 510 F. Supp 1039 (D. Mont. 1981), rev'd

on other grounds, 704 F.2d 143; and loss of ability to pursue an established course

of life, *Henricksen v. State*, 84 P.3d 38 (Mont. 2004).

Money damages are also the appropriate remedy under *Bivens.  Solida v.

McKelvey*, 820 F.3d 1090, 1094 (9th Cir. 2016).  In the analogous § 1983 context,

the Supreme Court has stated that the rules established for common law torts

regarding the elements of damages "provide the appropriate starting point" for the

damages inquiry under § 1983.  *Carey v. Piphus*, 435 U.S. 247, 257-58 (1978).

While application of common law tort rules may not provide a "complete solution"

in all cases, where the interests protected by the constitutional right and the

common law tort closely parallel each other, "it may be appropriate to apply the

tort rules of damages directly to the § 1983 action."  *Id.* at 258.

In this case, L.B. requests damages for 1) purchases/services necessitated by

the injury; 2) loss of established course of life; and 3) pain and suffering/emotional

injuries.  (Doc. 80 at 6-9.)  Notably, L.B. has not requested an award of punitive

damages.

12

### a.      Purchases/Services Necessitated by the Injury

Bullcoming's wrongful conduct resulted in L.B. becoming pregnant, and giving birth to a child.  She is providing full support for the child, without any contribution from Bullcoming.  (Doc. 82 at 37.)  L.B. has requested that she be awarded "the present value of the costs of purchases and services necessary for L.B. to parent D.B. to adulthood."  (Doc. 80 at 7.)  In other words, L.B. requests damages for the cost of raising D.B. from birth to the age of majority.

L.B. presents no authority to support the recovery of such damages.  In exercising supplemental jurisdiction over L.B.'s state tort claims, the Court is "bound to apply the law of the forum state to the same extent as if it were exercising its diversity jurisdiction."  *Bass v. First Pac. Networks, Inc.*, 219 F.3d 1052, 1055 n. 2 (9th Cir. 2000).  But it appears the Montana Supreme Court has never considered whether the costs and expenses of raising a child are recoverable as damages.  The Court must, therefore, predict how the Montana Supreme Court would likely decide the issue.  *Med. Lab. Mgmt. Consultants v. Am. Broadcasting Co., Inc.*, 306 F.3d 806, 812 (9th Cir.2002) (when an issue of state law arises and "the state's highest court has not adjudicated the issue, a federal court must make a reasonable determination of the result the highest state court would reach if it were deciding the case.").

The issue has been considered by many other jurisdiction, primarily in the medical malpractice context, where a child is born after an unsuccessful sterilization procedure.  In these "wrongful birth" or "wrongful conception" actions, three different lines of authority have emerged.

In the first line of authority, damages are not recoverable for the cost of raising a healthy child.  Under this majority view, courts have generally denied recovery based on various public policy grounds, including the speculative nature of the recovery, *Coleman v. Garrison*, 327 A.2d 757, 761 (Del. Super. Ct. 1974); the damages are out of proportion to the culpability of the wrongdoer, *Beardsley v. Wierdsma*, 650 P.2d 288, 292 (Wyo. 1982); and based on the concern the child will be damaged by the discovery that they are an "emotional bastard" who was unwanted, *Wilbur v. Kerr*, 628 S.W.2d 568, 571 (Ark. 1982).  But the principal public policy reason cited by most courts denying recovery is the "value of a child's life to the parents outweighs the associated pecuniary burdens as a matter of law."  *Chaffeee v. Selslar*, 786 N.E.2d 705, 708 (Ind. 2003).  As stated by the Supreme Court of Illinois "it is a matter of universally-shared emotion and sentiment that the intangible . . . 'benefits' of parenthood far outweigh any of the mere monetary burdens involved."  *Cockrum v. Baumgartner*, 447 N.E.2d 385, 388 (Ill. 1983).  While the cases in this group primarily involve medical malpractice claims, the rationale has also been applied to deny damages in the case of rape.

14

See e.g. *Miss. State Fed'n of Colored Women's Club Hous. for the Elderly in Clinton, Inc. v. L.R.*, 62 So.3d 351, 363-64 (Miss. 2010).

In the second group, courts allow for the recovery of the cost of rearing a child, but require that the award be offset by the benefits of parenthood.  Courts adopting this view generally rely on the Restatement (Second) of Torts § 920, which provides "[w]hen the defendant's tortious conduct has caused harm to the plaintiff . . . and in so doing has conferred a special benefit to the interest of the plaintiff that was harmed, the value of the benefit conferred is considered in mitigation of damages, to the extent that this is equitable."  See e.g. *Burke v. Rivo*, 551 N.E.2d 1, 5-6 (Mass. 1990); *Sherlock v. Stillwater Clinic*, 260 N.W.2d 169, 174-76 (Minn. 1977); and *Ochs v. Borrelli*, 445 A.2d 883, 886 (Conn. 1982).

Under the final line of authority, courts have permitted the full recovery for the cost of raising a child.  Courts in this minority group have generally relied upon a traditional tort analysis of causation and damages under applicable state tort law. See e.g., *Lovelace Med. Ctr. v. Mendez*, 805 P.2d 603, 611-14 (N.M. 1991); *Marciniak v. Lundborg*, 450 N.W.2d 243, 245-49 (Wis. 1990); and *Zehr v. Haugen*, 871 P.2d 1006, 1011-12 (Or. 1994).

It is unlikely the Montana Supreme Court would follow the first line of authority under the facts of this case.  Several of the public policy reasons cited for denying recovery for the cost of raising a child are not particularly compelling

15

when viewed in the context of rape as opposed to an ineffective sterilization procedure.

The recovery is certainly not out of proportion to the culpability of the defendant's conduct.  Requiring the perpetrator of a rape to pay the cost of raising a child conceived from his criminal conduct can hardly be viewed as unjust.

It is also very doubtful that D.B. will view herself as an "emotional bastard" and be further damaged by learning of the recovery.  D.B. will almost certainly learn the circumstances of her conception at some point in her life; that will be at L.B.'s discretion.  But L.B. has more than demonstrated that D.B. is not an "unwanted child" by making the decision to carrying the child to term, caring for the child on her own, and providing for the child's emotional support.  Awarding damages for the cost associated with raising D.B. simply provides that she will not also bear all of the expense of raising the child.

The costs are also not too speculative to award.  Economist Ann Adair, Ph.D., testified at the damages hearing that the U.S. Department of Agriculture has conducted studies of the "hard costs" associated with raising a child in different areas of the country, and with different population settings, income levels, and family compositions.  Dr. Adair utilized this data to calculate the present value of the cost of raising D.B.

Finally, the theory that the benefit of raising a child always outweighs the

economic cost may be a hopeful, idealistic judicial declaration, but as one court

found, it "simply lacks verisimilitude." *Burke*, 551 N.E.2d at 4. Noting the

extensive use of medical interventions to prevent or terminate pregnancies, the

court in *Burke* recognized that "large numbers of people do not accept parenthood

as a net positive circumstance." *Id.* This is particularly true in the case of rape,

where 70% of women choose to terminate a resulting pregnancy and clearly do not

view the benefits of parenthood as a positive outcome from the rape. (Doc. 82 at

64.) The number of women who choose to raise the child they carry to term is

undoubtedly a smaller percentage. According to Plaintiff's expert Rebecca Burns

Weston, LCSW, those that chose to bear and raise the child are continually plagued

with recurrent trauma as a result of the rape. Therefore, at least in the case of rape,

it is certainly not "a universally-shared emotion and sentiment" that the benefits of

parenthood outweigh the burdens of having the child.

It is also unlikely that the Montana Supreme Court would apply the "benefit

rule" derived from the Restatement (Second) of Torts § 920. While several courts

have relied upon the provision in the medical malpractice setting, it does not

appear applicable under the circumstances presented here. First, the comments to

§ 920 state that "[d]amages resulting from an invasion of one interest are not

diminished by showing that another interest has been benefitted." *Id.*, Comment b.

17

For example, "[d]amages for pain and suffering are not diminished by showing that the earning capacity of the plaintiff has been increased by the defendant's act." *Id.* Courts applying this section to a claim for expenses for raising a child do not explain how a claim for pecuniary loss can be diminished and offset by an alleged emotional benefit.

More importantly for this case, however, is the requirement in both the language of § 920 and in Comment f. to the section, that mitigation of damages for benefit conferred should only occur "to the extent that this is equitable."  It would simply not be equitable to relieve Bullcoming of any responsibility to pay for the cost of raising D.B. because of the "benefit" he conferred to L.B.  It is also not equitable to require L.B. to pay the cost of raising D.B. simply because she loves her daughter and will hopefully receive emotional benefit from her parental relationship.  Requiring Bullcoming to pay the cost of raising D.B. as damages in this action is nothing more than what Bullcoming is legally responsible to do as the biological father of the child.  Even if Bullcoming's parental rights are ultimately terminated, an award of damages for these costs will ensure that Bullcoming is liable for the cost of raising the child, regardless of his legal parental status.

In addition, at least one court has noted the public policy concerns with applying the benefit rule in this situation.  The Supreme Court of New Mexico recognized that "[a] trial over such issues . . . could result in the unseemly

spectacle of the parents attempting to prove how slight or nonexistent was the psychological benefit they received from their additional child in order to minimize the offset to their nonpecuniary interests." *Lovelace Med. Ctr.*, 805 P.2d at 613.

Therefore, given the circumstances of this case, the Montana Supreme Court would likely side with the minority view and allow the full recovery of the cost of raising D.B., reduced to present value. As discussed above, the measure of damages for a tort under Montana law is "the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not." Mont. Code Ann. § 27-1-317. Under this standard, injured parties have been permitted to recover damages for future economic losses which can be established with reasonable probability, including loss of future earnings, reasonable expenses for medical, surgical, and hospital services, supplies required for future treatment, and nursing care. There is no question in this case that Bullcoming's wrongful conduct was the proximate cause of the birth of D.B. and the resulting costs and expenses for raising her. Those costs are properly compensable as a detriment proximately caused by Bullcoming's wrongful conduct under a straight-forward application of Montana law. There is no reason to carve out an exception to the recovery of those losses as damages in this case.

As to the amount to be awarded, Dr. Adair testified that she used the USDA data for the cost of raising a child that most closely paralleled L.B.'s

19

circumstances.  That is, a single-family household in a rural setting with income less than $59,000 per year.  (Doc. 82 at 14.)  From this data, she calculated the present value of the cost of raising D.B. through age 17 to be $135,144.  (*Id.*)

Dr. Adair also calculated the present value of the costs for counseling for D.B. from age 5 through age 17, based on the assumption that she would require a one-hour session per week at the cost of $150.00 per session.  (*Id.* at 15.)  Ms. Weston confirmed in her testimony that such counseling is reasonable and necessary.  (*Id.* at 70-71.)  Dr. Adair calculated the present value of the cost of the counseling to be $116,710.  (Hearing Ex. 1 at 6.)

Dr. Adair also provided the present value of the cost of tutoring D.B. from age 6 through age 17.  But no evidence was provided that indicated D.B. will likely need the services and incur the expenses.  Thus, no damages should be awarded for future tutoring.

Therefore, in total L.B. should be awarded $251,854 for the present value of the costs and expenses of raising D.B. to adulthood.

### b.    Loss of Established Course of Life

Under Montana law, a plaintiff can also recover damages for loss of ability to pursue an established course of life, which is compensation for the "impairment of the ability to pursue one's chosen pursuits in life."  *Henrickson v. State*, 84 P.3d 38, 54 (Mont. 2004).

L.B. has two other children who are 15 and 16 years old.  (Doc. 82 at 35.)
She did not intend to have any additional children.  (*Id.* at 28.)  She was therefore
near the end of her child-rearing years.  She has now been forced to start anew and
raise a child from infancy to adulthood.  Becoming a parent changes the course of
life, possibly more than any other event in a typical lifetime.  This is particularly
true when raising a young child, when the demands on a parent are at times
unrelenting.  The demands of parenthood generally subside as the child ages.

The same is true for L.B.  The time and effort necessary to raise D.B. will
dominate L.B.'s life during D.B.'s preschool years.  The demands on L.B. will
gradually subside during D.B.'s primary school years, and will likely diminish
further as D.B. approaches adulthood.  It would therefore be appropriate to award
damages accordingly.  The Court finds it would be reasonable to award $25,000
per year for the first six years of D.B.'s life, $20,000 per year for years 7-12, and
$15,000 per year for years 13-18.  In total, L.B. should be awarded $360,000 for
her loss of established course of life.

### c.    Physical and Emotional Pain and Suffering

As Ms. Weston testified, rape is the ultimate violation of another human
being.  It is a horrific, traumatic event, which will almost universally result in
profound mental and emotional consequences.  Ms. Watson testified that in
circumstances where a rape victim becomes pregnant and decides to raise the child,

the emotional impact to the victim can be broken down into three stages.  There is first the trauma of the rape itself.  It very common to develop PTSD as a result of the event, with associated symptoms of intrusive thoughts and dissociation.  The rape is also almost always followed by shame, guilt, and self-blame.  The second emotional impact is caused by the pregnancy itself.  It is very common for the victim to experience a very difficult internal conflict about whether they want to have the child.  If they decide to carry the baby, they typically have very complicated emotions about the child growing inside their body.  Finally, after the child is born, the victim will have a conflict every day between the child she loves, and the fear and anger and other emotional consequences of the traumatic event.

L.B. testified that she suffered emotional trauma at each of these stages.  She testified of the obvious shock and trauma of the rape itself.  She has been diagnosed with PTSD and a major depressive disorder as a result of the event.  She suffers from stress and anxiety, and describes symptoms such as sadness, worry, numbness, self-seclusion, intrusive thoughts, and sleep disturbances.  As is typical of many rape victims, she blames herself for the rape.  She questions what she could have done differently, whether she should have worn different clothing, and why he chose her as his victim.

L.B. was also fearful of reporting the event to law enforcement.  Since her assailant was a law enforcement officer, she did not believe that other law

22

enforcement would believe her.  She continues to be fearful anytime she sees a law enforcement officer, particularly a tribal officer, which triggers her PTSD symptoms.

After learning she was pregnant, L.B. became very emotionally upset and experienced embarrassment and shame.  She seriously considered terminating the pregnancy, and she had to deal with a very difficult internal conflict between the origin of the pregnancy and her personal principles which opposed terminating the pregnancy.  She was afraid to tell her family the identity of the father of the child and went into seclusion.  She did not reveal what had happened to her until she was forced to see a health care provider concerning an unrelated condition.  When the incident was subsequently reported by the health care provider, Bullcoming denied the rape, and L.B. was subject to an investigation by the FBI.  This included subjecting D.B. to DNA testing immediately after birth to determine paternity.  She was also afraid that Bullcoming was going to retaliate against her.  She knew he was a policeman and a veteran, and she was afraid he knew "military fighting ways" and was going to hurt her.

Since the birth of her child, L.B. has been subjected to a daily reminder of the event.  On the one hand, she testified that she loves the child and called her a "little blessing."  On the other, she testified she looks just like Bullcoming, and she has to deal with the reminder of the rape every day of her life.

In short, the emotional impact of this event has often been overwhelming for L.B.  She has undergone counseling, which has been helpful.  Nevertheless, she continues to struggle with PTSD and major depression, and according to Ms. Weston, will likely do so to varying degrees for the rest of her life.

Therefore, the Court recommends that L.B. be awarded $250,000 for the physical and emotional pain and suffering as result of the rape itself; $250,000 for the physical and emotional pain and suffering as a result of the resulting pregnancy and birth; and an additional $500,000 to compensate L.B. for her mental and emotional pain and suffering she will likely endure for her remaining life expectancy.  In total, the Court recommends that L.B. be awarded $1,000,000 as compensation for her physical and emotional pain and suffering.

## IV.    CONCLUSION

Based on the foregoing, **IT IS RECOMMENDED** that default judgment be entered in favor of L.B. and against Bullcoming, and that damages be awarded to L.B. in the amount of $1,611,854.

**NOW, THEREFORE, IT IS ORDERED** that the Clerk shall serve a copy of the Findings and Recommendations of United States Magistrate Judge upon the parties.  The parties are advised that pursuant to 28 U.S.C. § 636, any objections to the findings and recommendations must be filed with the Clerk of Court and copies served on opposing counsel within fourteen (14) days after service hereof, or

objection is waived.

DATED this 6th day of May, 2020.

_____
TIMOTHY J. CAVAN
United States Magistrate Judge