IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| L.B.,<br><br>    Plaintiff,<br><br>    vs.<br><br>UNITED STATES OF AMERICA,<br>and BUREAU OF INDIAN AFFAIRS,<br><br>    Defendants. | CV 18-74-BLG-DWM<br><br><br>FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW |

The trial in this case stems from the sexual assault of Plaintiff L.B. by

Bureau of Indian Affairs ("BIA") Officer Dana Bullcoming in 2015. L.B., a

Northern Cheyenne tribal member, brought this suit against the United States of

America, the BIA, and Officer Bullcoming in 2018. She functionally asserted a

*Bivens* claim and state-law tort claims against Officer Bullcoming,[1] and sought to

hold the government liable for Officer Bullcoming's tortious conduct under the

---

[1] L.B. sued Officer Bullcoming in his individual capacity, (Doc. 1), and in its
Findings and Recommendations, the Court explains "[t]he fact that L.B. incorrectly
cite[d] § 1983 is not fatal" and that "the Court has jurisdiction of L.B.'s *Bivens*
claim under its general federal question jurisdiction, 28 U.S.C. § 1331" and "may
exercise supplemental jurisdiction of L.B.'s state tort claims under 28 U.S.C.
§ 1367(a)," (Doc. 85 at 7). The Findings and Recommendations were adopted in
full by the Court in its order of default judgment against Officer Bullcoming.
(Doc. 88.)

Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346, 2671–80. (Doc. 1.)
Because Officer Bullcoming failed to answer or otherwise challenge the claim,
default judgment was entered against him in the amount of $1,611,854. (Docs. 88,
89.)

In regard to the case against the government, L.B. appealed the Court's grant
of summary judgment in favor of the United States, raising one issue: whether,
under Montana law, Officer Bullcoming's sexual assault of L.B. was within the
scope of his employment as a law-enforcement officer for the BIA. (Docs. 90, 92.)
The Ninth Circuit then certified the following question to the Montana Supreme
Court: "Under Montana law, do law-enforcement officers act within the course and
scope of their employment when they use their authority as on-duty officers to
sexually assault members of the public?" *L.B. v. United States*, 8 F.4th 868, 872
(9th Cir. 2021); (Doc. 92 at 1). The Montana Supreme Court reframed the
question and ruled that a triable issue of fact existed as to whether Officer
Bullcoming was acting within the scope of his employment under the facts as
certified. *See L.B. v. United States*, 515 P.3d 818, 821, 825 (Mont. 2022).
Following remand, this Court again granted summary judgment in favor of the
United States on the course-and-scope issue. (Doc. 149.) L.B. appealed. (Doc.
152.) The Circuit reversed and remanded the case for trial. (Doc. 156.)

2

A one-day bench trial took place in Billings, Montana on February 4, 2025. L.B. presented three fact witnesses: L.B.; retired FBI Agent John Teeling, who first interviewed L.B. and now works as a private investigator, consultant, and expert witness; and private investigator Mark Fullerton. The government presented three fact witnesses: Lenora Nioce, Special Agent in Charge for the BIA Office of Justice Services ("BIA-OJS"), District V, in Billings, Montana; Jonathan Tsosie, Assistant Special Agent in Charge for the BIA-OJS in that same District, who from 2010 to 2014 worked as a canine officer on the Northern Cheyenne Reservation; and Senior Special Agent Donovan Wind employed with the Department of Interior Law Enforcement Services and Security who served as the Chief of Police for the Northern Cheyenne Indian Reservation from 2012 to 2015. The parties also presented the deposition testimony of Officer Bullcoming.

The Court finds L.B. to be credible. She was often tearful and at times could barely speak when she testified. The Court also finds Teeling, Fullerton, and Agents Nioce, Wind, and Tsosie to be credible. The Court does not find the sworn testimony of Officer Bullcoming to be credible.

Based on the evidence and testimony presented at the trial, and further considering the applicable law, the following findings of fact and conclusions of law are made pursuant to Federal Rule of Civil Procedure 52.

FINDINGS OF FACT

**I.    Sexual Assault of L.B.**

1.   On October 31, 2015, L.B., a Northern Cheyenne tribal member, lived within the Northern Cheyenne Reservation in Lame Deer, Montana.  (L.B.)  She resided with her mother and two children in Lame Deer after having left North Dakota to escape an abusive relationship.  (L.B.)  At the time, her children were 10 and 12 years old, respectively.  (L.B.)

2.   On October 31, 2015, Officer Dana Bullcoming was employed by the BIA-OJS as a patrol officer policing the Northern Cheyenne Reservation.  (Agreed ¶ 1; Nioce.)  He patrolled the Northern Cheyenne Reservation alone both that day and routinely.  (Nioce.)

3.   L.B. and her mother had been drinking the night of October 30, 2015, arriving at L.B.'s residence around midnight.  (Agreed ¶ 2; L.B.)  In the early morning hours of October 31, 2015, L.B. called law enforcement, reporting her mother was driving while intoxicated.  (Agreed ¶ 2; L.B.)

4.   Officer Bullcoming responded to the call.  (Agreed ¶ 3.)  After locating L.B.'s mother's car, Officer Bullcoming left the scene and drove to L.B.'s residence.  (Agreed ¶ 3.)

5.   Officer Bullcoming went to L.B.'s residence under the auspices of his authority as a law enforcement officer investigating her call to the police.  (Nioce.)

4

6.  L.B. was sleeping on a recliner in her residence and awoke to Bullcoming standing over her in his uniform, wearing both his badge and gun.  (L.B.)

7.  At this time, L.B. was worried about being arrested because beer cans were present, and the Northern Cheyenne Reservation is a dry reservation.  (Agreed ¶ 4.)

8.  Officer Bullcoming asked L.B. who was else was in the residence, and she told him her kids were in their rooms.  (L.B.)  Officer Bullcoming informed L.B. he could arrest her, call social services, and take her children away.  (L.B.)  L.B. told Officer Bullcoming she did not want to go to jail, and that she had started a new job, which she would lose it if she was arrested.  (Agreed ¶ 5; L.B.)

9.  L.B. and Officer Bullcoming walked to his patrol car outside where he administered a breathalyzer test.  (Agreed ¶ 6; L.B.)  At no time did L.B. enter his vehicle.  (Agreed ¶ 6.)  Throughout this interaction, L.B. felt that she had to do what Officer Bullcoming said because he was a police officer.  (L.B.)  The results of the breathalyzer were .132 or .136.  (Agreed ¶ 6.)

10.  L.B. and Officer Bullcoming then walked toward L.B.'s garage, and Bullcoming repeatedly stated, "something needs to be done."  (Agreed  ¶ 7; L.B.)  L.B. responded, "Like, what do you mean? Like sex?"  (Agreed ¶ 7.)  "Yes," Officer Bullcoming responded.  (Agreed ¶ 7.)

5

11.   L.B. believed she had only two choices: to be arrested meaning her children would be taken away and she would lose her job, or to have sex with Officer Bullcoming. (L.B.)

12.   L.B. then jokingly said to Officer Bullcoming that he had always had a crush on her since high school. (L.B.)  Officer Bullcoming did have a crush on L.B. (Ex. 105 at 5.)  Despite making this remark, L.B. believed that Officer Bullcoming showed up at her residence the night of the assault because she called the police, not because of a school-age crush. (L.B.)

13.   Both L.B. and Officer Bullcoming acknowledge that they have known of each other since childhood, that their moms were friends, and that L.B. was friends with Officer Bullcoming's sister when they were teenagers. (L.B.; Ex. 105 at 5.)

14.   Officer Bullcoming then had unprotected sexual intercourse with L.B. (L.B.; *see* Agreed ¶ 8.)  L.B. testified she perceived Officer Bullcoming was assaulting her to punish her, and that it felt like punishment when Officer Bullcoming was penetrating her. (L.B.)

15.   L.B. became pregnant as a result of the assault and had a child, D.B. (Agreed ¶ 9.)

16.   Contrary to BIA policy, Officer Bullcoming did not generate a report relative to his investigation of L.B. for consuming alcohol on the Northern Cheyenne Reservation. (Nioce.)  Officer Bullcoming's direct supervisor did not

6

notify Officer Bullcoming's second-line supervisor, Senior Special Agent Wind, that a report was not submitted. (Wind.)

17.  L.B. was initially reluctant to report the incident out of fear that cops would stick up for cops, and they would not believe her. (L.B.) L.B. reported the incident after finding out she was pregnant, which was approximately one month after the assault. (L.B.)

18.  Then-FBI Agent Teeling interviewed L.B. (Teeling.) During that interview, it became clear that L.B. feared she would be in trouble for sleeping with Officer Bullcoming to avoid arrest. (Teeling.)

19.  When the FBI initially questioned Officer Bullcoming about sexually assaulting L.B., he denied that he had sexual intercourse with her on the day in question or that he had even entered her residence. (Ex. 6 at 2–3.) He told the FBI that he looked through L.B.'s windows, knocked on her door, got no answer, and left the residence. (Ex. 6 at 2–3.)

20.  FBI agents came to the hospital the day after L.B. gave birth to take her newborn child's DNA to determine whether L.B. or Officer Bullcoming was telling the truth regarding the assault. (L.B.) D.B. is the biological child of L.B. and Officer Bullcoming. (L.B.; Ex. 105 at 14; *see* Agreed ¶ 9.)

21.  On July 24, 2017, Officer Bullcoming was criminally charged by the United States with deprivation of rights under color of state law and two counts of

false statement to a federal officer.  (Ex. 110.)  He pleaded guilty to the first count pursuant to a plea agreement, (Ex. 104), and was sentenced to 36 months in custody, (Ex. 115 at 35).

22.   On April 23, 2018, L.B. brought this civil suit.  (Doc. 1.)

23.   On May 26, 2020, L.B. was awarded default judgment against Officer Bullcoming in the amount of $1,611,854.00, (Docs. 88, 89), which has not been paid, (L.B.).

24.   The United States does not dispute that Officer Bullcoming sexually assaulted L.B. or that he abused his authority in doing so.  (Doc. 181 at 7–8.)

**II.    BIA's Role on the Northern Cheyenne Reservation**

25.   The Northern Cheyenne Tribe has approximately 12,000 enrolled members with about half residing on the Northern Cheyenne Reservation, which is approximately 444,000 acres in size.  (Ex. 100.)  Many people on the Northern Cheyenne Reservation face economic challenges.  (Teeling.)

26.   Consuming alcohol is a crime on the Reservation.  (Agreed ¶ 10.)

27.   Pursuant to federal law, the United States, through the BIA, provides policing on the Reservation.  (Agreed ¶ 11.)  Policing by the federal government is distinct to reservations.  Accordingly, there is a unique power imbalance between the people living on the Reservation and the law enforcement that police it. (Teeling.)

8

28.   The BIA faces internal issues, such as low morale, staff shortage, and staff turnover.  (Nioce.)  As a result, there are often only two BIA officers policing the Reservation at any given time, which is insufficient for a jurisdiction of its size. (Nioce.)  BIA officers regularly patrol the Reservation alone, and while it would be preferred to have two officers per patrol car, as opposed to only one, funding does not permit this.  (Nioce.)

29.   BIA officers encounter citizens alone at late-night hours, and, in 2015, the BIA did not require its officers to wear body cameras.  (Nioce.)

30.   Having a BIA law enforcement officer in a patrol vehicle policing various communities on the Reservation has a beneficial impact of deterring criminal conduct and obtaining informational tips from community members.  (Nioce.)  For this reason, model officers use downtime (the time not responding to a call, or arresting and transporting an arrestee) to patrol communities and interact with the public.  (Nioce.)

31.   BIA law enforcement officers have authority conferred by the United States as their employer to detain, arrest, frisk, search, seize, and even use deadly force if necessary.  (Nioce.)  The job duties of these officers include initiating nonconsensual and at times invasive physical contact with members of the public pursuant to law enforcement goals.  (Nioce.)  BIA law enforcement officers may

9

have to exert physical force over someone they are investigating. (Nioce.) +Such force can be unauthorized. (Nioce.)

32.  BIA law enforcement officers wear visible signs of employer-conferred authority including a uniform, badge, service weapon, and handcuffs. (Nioce.)

33.  BIA officers are also given the discretion to charge crimes or issue warnings, including the discretion to charge or not charge the crime of consuming alcohol on the Reservation. (Nioce.)  Such discretion allows for a responsive allocation of limited resources and benefits the officer and the officer's relationship with the community, which in turn benefits the BIA and United States as the officer's employer. (Nioce; Wind.)

34.  Pursuant to the BIA communications management system, calls from the community come in, a dispatcher receives the call, and then it is assigned to an officer on duty. (Wind.)  Once assigned, officers are required to write a report after they respond. (Wind.)  However, officers may think they have discretion over whether to write a report and officers do fail to file reports; not every officer is disciplined for their failure. (Wind.)  Supervisors can see which calls have outstanding reports. (Wind.)

35.  According to L.B., who lived on the Reservation for 20 years, there were rumors that the cops were having sex with the inmates in exchange for losing their paperwork so they could get out of prison early. (L.B.)

10

36.   Special Agent in Charge Nioce testified she is aware of at least two other allegations of sexual assault by BIA officers on the Northern Cheyenne Reservation subsequent to Officer Bullcoming's sexual assault of L.B.  (Nioce.)  In its 2018 response to interrogatories, the government stated, "an Internal Affairs search related to sexual misconduct allegations from the Northern Cheyenne law enforcement reflect four complaints, of which one relates to Bullcoming."  (Ex. 101 at 2.)

37.   Senior Special Agent Wind served in the field for approximately 28 years. (Wind.)  During that period, he was not aware of any BIA law enforcement officer on the Reservation, other than Officer Bullcoming, using his or her position to coerce sex. (Wind.)

38.   Assistant Special Agent in Charge Tsosie has served as a law enforcement officer with the BIA for approximately 20 years.  (Tsosie.)  During that period, he was not aware of any BIA law enforcement officer on the Reservation, other than Officer Bullcoming, using his or her position to coerce sex.  (Tsosie.)

39.   Teeling testified that there is a pattern among all law enforcement agencies to protect each other when someone is not following the rules.  (Teeling.)

**III.    BIA Policy regarding Sexual Misconduct**

11

40.   The BIA Law Enforcement Handbook provides guidance on agency standards for BIA law enforcement, and officers rely on its guidance in performance of their duties.  (Nioce.)

41.   The 2015 BIA Law Enforcement Handbook, (Ex. 200 ("BIA Handbook")), states that "[t]he fundamental duties of a police officer include serving the community; safeguarding lives and property; protecting the innocent; keeping the peace; and ensuring the rights of all to liberty, equality, and justice." (Ex. 200 at 21).

42.   Section 1-03 of the Handbook is titled "sexual misconduct." (Ex. 200 ("BIA Handbook.")) This section lists sexual misconduct as a prohibited practice and states that such misconduct shall be disciplined up to and including termination. (Ex. 200 at § 1-03-01.)

43.   BIA officers also attend yearly trainings, which advise officers that any type of criminal conduct goes against the BIA Codes of Conduct and Ethics, and is, accordingly, prohibited. (Nioce; *see* Ex. 200 at § 1-03-02.)

44.   The BIA Handbook states that "[a]ny employee of the [BIA-OJS], who is made aware of any violation" of the prohibition of sexual misconduct "is required to report the alleged violation to their supervisor.  The supervisor will immediately contact the Internal Affairs Division [] who will immediately initiate an investigation in accordance with established OJS policy.  The investigation may

involve other investigative elements of OJS as necessary, and any forensic evidence will be protected and processed immediately." (Ex. 200 at § 1-03-02(A).)

45. A BIA investigation into Officer Bullcoming's sexual assault of L.B. did not occur. (Nioce.) An FBI investigation into the assault did occur and resulted in the criminal prosecution and conviction of Officer Bullcoming. (Nioce.)

46. Teeling testified that Mr. Heenan, L.B.'s counsel, informed him about an allegation that a BIA officer shot an unarmed man in the back. (Teeling.) Teeling testified there was a rumor that the same BIA officer had raped a 14-year-old girl. (Teeling.) Teeling recently interviewed this child, and she stated that the officer had offered her sex as an alternative to going to jail. (Teeling.) Teeling believes the FBI is investigating this allegation but is not sure of its status. (Teeling.)

47. Between the time Officer Bullcoming sexually assaulted L.B. and the government's response to interrogatories in 2018, the BIA became aware of three allegations of sexual assault committed by BIA officers on the Reservation in addition to the sexual assault committed by Officer Bullcoming. (Ex. 101 at 2.)

48. It is not BIA policy to rape people, and rape and sexual assault have no place in law enforcement. (Teeling.) However, sexual assault and rape by law enforcement officers does occur and there is a pattern of its existence. (Teeling.)

49.  Before Officer Bullcoming's criminal sentencing hearing, the United

States recognized then-contemporary occurrences of sexual assault committed by

law enforcement officers stating:

> Bullcoming is not the first former police officer to get sentenced for
> deprivation of rights under color of law in the Ninth Circuit. In *United
> States v. Connelly*, Judge Morris sentenced a former tribal police officer
> on the Blackfeet Indian Reservation to 24 months of incarceration
> following his misdemeanor depravation of rights conviction and felony
> conviction for providing a false statement to a federal officer related to
> forcing a woman to perform oral sex on him to avoid going to jail.
> *United States v. Connelly*, 613 Fed. Appx. 604, 605 (9th Cir. 2015)
> (unpublished) (Connelly was acquitted of the sexual abuse charge and
> sentenced to 12 months on the misdemeanor conviction and 24 months
> on the false statement, to be served concurrently). In *United States v.
> Perez*, a former San Bernardino Police Department officer was
> sentenced to 300 months for forcing one woman to engage in oral sex
> and another woman to engage in vaginal sex using his authority as a
> police officer. *United States v. Jose Jesus Perez*, 2016 WL 1003368,
> (9th Cir. 2016, Appellant's Br. at 2, 26). In *United States v. Feliciano
> Sanchez*, a Bell, California police officer pled guilty and was sentenced
> to 108 months for forcing a woman to give him oral sex following a
> traffic stop. *United States v. Feliciano Sanchez*, 2011 WL 3689102 (9th
> Cir. 2011, Appellant's Br. at 5).

(Ex. 109 at 7.)

## IV.    Officer Bullcoming as a BIA Officer

### a.  Career

50.  In 2015, Officer Bullcoming was employed by as a BIA patrol officer

policing the Northern Cheyenne Reservation.  (Agreed ¶ 1.)  He patrolled the

Northern Cheyenne Reservation routinely.  (Nioce.)

51. Officer Bullcoming is a veteran of the United States Army and the United States Marine Corps. (Wind; Tsosie.)

52. Senior Special Agent Donovan Wind was Officer Bullcoming's second-line supervisor at the time of the assault. (Wind.) Senior Special Agent Wind testified that Officer Bullcoming underwent a thorough and lengthy background check and does not believe that if this history suggested sexual misconduct, he would have been hired. (Wind.)

53. According to Senior Special Agent Wind, Officer Bullcoming was a good police officer and employee, and he did his job thoroughly and professionally. (Wind.) Wind did not receive community complaints regarding Officer Bullcoming, and Officer Bullcoming consistently received a three or four out of five in his annual performance reviews. (Wind.) Three represents satisfactory and four represents extraordinary. (Wind.) Accordingly, Wind took steps towards promoting Officer Bullcoming. (Wind.)

54. When Senior Special Agent Wind heard about the investigation into Officer Bullcoming's assault of L.B. he was disappointed because it was difficult for him to believe that Officer Bullcoming would do that based on their history and he recognized that such an investigation would hurt "us as a department." (Wind.)

55.   As his coworker, Assistant Special Agent in Charge Tsosie stated that Officer Bullcoming was a dependable and professional officer who he would rely on if he needed backup.  (Tsosie.)

56.   The only criticism of Officer Bullcoming expressed by Senior Special Agent Wind and Assistant Special Agent in Charge Tsosie was that he, like many BIA officers, was behind on his reports and frequently did not turn in required reports.  (Wind; Tsosie.)

57.   Neither Senior Special Agent Wind nor Assistant Special Agent in Charge Tsosie had any reason to believe, based on their professional experiences with him, that Officer Bullcoming would sexually assault anyone he was investigating. (Wind; Tsosie.)

58.   Officer Bullcoming did have sex with women while on duty as a BIA officer.  (Ex. 105 at 12; Ex. 106 at 3.)

59.   Officer Bullcoming's second-line supervisor, Senior Special Agent Wind, and his coworker, Assistant Special Agent in Charge Tsosie, were both unaware that he was having sex with women while on duty.  (Wind; Tsosie).

60.   Private Investigator Mark Fullerton was hired by L.B. to locate and serve Officer Bullcoming.  (Fullerton.)  Fullerton testified that in December 2022, he spoke with Officer Bullcoming on the phone and that Officer Bullcoming stated he had approximately 20 sexual encounters with other women while on duty.

(Fullerton.)  However, in his 2022 deposition, Officer Bullcoming testified that while he was on duty and in uniform as a BIA law enforcement officer policing the Northern Cheyenne Reservation, he had sex with "a dozen or so" women and each one of those sexual encounters was consensual and not "in exchange for leniency or any sort of warning."  (Ex. 105 at 12.)

61.  Assistant Special Agent in Charge Tsosie testified that he does not know whether Officer Bullcoming's sexual encounters while on duty were similar to his sexual assault of L.B.  (Tsosie.)

62.  On November 6, 2024, Assistant Special Agent in Charge Tsosie was deposed as a designee of the BIA pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure regarding the following topic: "all knowledge BIA has of other women that Officer Bullcoming had sex with while he was on the job as a police officer." (Ex. 107.)  As a designee, Assistant Special Agent in Charge Tsosie testified that he had not read Officer Bullcoming's deposition and did no investigation into the other "dozen or so" women Officer Bullcoming testified he had had sex with while policing on the Reservation.  (Ex. 107 at 4–5.)

63.  Officer Bullcoming was re-deposed on November 13, 2024, wherein he testified that the "dozen or so" women he previously testified that he had sex with while on duty was actually only three women.  (Ex. 106 at 3.)

17

64. Any allegation of sexual misconduct requires an administrative investigation under BIA policy. (Nioce). However, the BIA did not investigate the women Bullcoming testified to having had sex with while on duty, (Nioce), regardless of whether there were three, twelve, or twenty.

### b. Criminal Proceeding

65. In 2017, the United States criminally charged Officer Bullcoming with deprivation of rights under color of law in violation of 18 U.S.C. § 242 ("Count 1"), and two counts of false statement to a federal officer in violation of 18 U.S.C. § 1001 ("Counts 2 and 3"). (Ex. 110.) As to Count 1, the Indictment specifically alleged that Officer Bullcoming, while acting under color of law, "coerced L.B. into engaging in sexual intercourse with him under threat of arrest if she refused" thereby depriving L.B. of her Constitutional rights, including the right not to be deprived of liberty without due process and the right to bodily integrity. (*Id.* at 1.)

66. Officer Bullcoming subsequently pleaded guilty to Count 1 pursuant to a plea agreement, (Ex. 104), was sentenced, (Ex. 115), served his sentence, and has been released from custody, (*see id.*).

67. At his change of plea hearing, Officer Bullcoming testified that "at the time of this incident, I was a BIA police officer. And using that position, I did coerce the individual to engage in sex." (Ex. 104 at 24.) He further admitted that he coerced L.B. into sexual intercourse under the threat of arrest, that he deprived

18

L.B. of her of liberty without due process, that he acted with bad purpose and intending to deprive L.B. of that right, and that L.B. suffered bodily injury as a result of his actions. (*Id.* at 24–25.)

68.   Following the change of plea hearing, and prior to sentencing, the government filed a sentencing memorandum stating that at the time of the assault "L.B. was in a position . . . that no person should ever face – have sex with an officer or go to jail." (Ex. 109 at 5.)

69.   At the sentencing hearing, the Court found that Officer Bullcoming "took advantage of [his] position of authority on that night and then used that to take advantage of [L.B.]" (Ex. 115 at 26.)

70.   In his 2022 deposition, Officer Bullcoming testified that he was not actually guilty of the crime he pleaded guilty to, and that he had lied under oath at his change of plea hearing by pleading guilty and testifying that "at the time of this incident I was a BIA police officer, and using that position, I did coerce the individual to engage in sex." (Ex. 105 at 13–14.) He further testified that his decision to plead guilty was based on his court-appointed attorney's explanation that if Officer Bullcoming chose to go to trial, he would likely get a sentence of at least ten years if found guilty. (*Id.* at 14.)

### c.   Officer Bullcoming's Inconsistent Testimony

71.   Officer Bullcoming gave at least five statements regarding his conduct in
this case: (1) when he was interviewed by the FBI on February 11, 2016, (Ex.
114); (2) during his plea colloquy on December 19, 2017, (Ex. 104); (3) when he
was interviewed by Private Investigator Fullerton in December 2022, (Fullerton);
(4) when he was deposed on December 14, 2022, (Ex. 105);  and (5) when he was
deposed again on November 13, 2024, (Ex. 106).  Officer Bullcoming's
statements—including those under oath—are inconsistent and unreliable.

72.   In his initial FBI interview, Officer Bullcoming denied that he had sexual
intercourse with L.B., or that he had even entered her residence.  (Ex. 6 at 2–3.)
Instead, he told the FBI that he only looked through L.B.'s windows, knocked on
her door, got no answer, and left the residence.  (*Id.*)

73.   Officer Bullcoming testified in his 2022 deposition that he lied under oath
during his plea colloquy when he admitted to using his position of authority to
coerce L.B. into committing sexual acts.  (Ex. 105 at 13–14; *see* Ex. 104 at 24.)

74.   In his 2022 deposition, Officer Bullcoming also testified that he had sex
with about a dozen women while on duty as a BIA officer.  (Ex. 105 at 12.)  In his
2024 deposition, however, he testified that he only had sex with three other women
while on duty.  (Ex. 106 at 3.)  Moreover, he told Private Investigator Fullerton the
number of women was at least twenty.  (Fullerton.)

75.    Accordingly, Bullcoming's testimony is considered not credible and has not been relied on in resolving the disputes in this case.

### CONCLUSIONS OF LAW

76.    The sole claim at trial is a Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346, 2671–80, claim against the United States based on Officer Bullcoming's employment with the BIA.  The FTCA waives the United States' sovereign immunity for certain tort actions and vests federal district courts with exclusive jurisdiction over suits arising from the tortious conduct of government employees. *See* 28 U.S.C. § 1346(b)(1); *F.D.I.C. v. Meyer*, 510 U.S. 471, 475–76, (1994); *Jerves v. United States*, 966 F.2d 517, 518 (9th Cir. 1992).  Under the FTCA, a plaintiff may only sue the United States for the tortious act of its employee if the employee was "acting within the scope of his office or employment." 28 U.S.C. § 1346(b)(1).  The single, dispositive question here is whether Officer Bullcoming was acting within the course and scope of his federal employment when he sexually assaulted L.B.

77.    Whether a government employee acted in the scope of his employment is determined by state law. *See Wilson v. Drake*, 87 F.3d 1073, 1076 (9th Cir. 1996).  The plaintiff bears the burden of establishing this jurisdictional requirement. *See e.g., Prescott v. United States*, 973 F.2d 696, 701 (9th Cir. 1992) (explaining the

21

general principal that a party suing the United States bears the burden of proving

waiver of immunity in the FTCA context).

78.  In *L.B. v. United States*, the Montana Supreme Court held that the

following two-prong test governs the course-and-scope question:

> [I]f an on-duty police officer obtains consent by misusing official
> authority, the wrongful act may be within the scope of employment if
> it arose out of the employment and was at least partially motivated by
> an intent or purpose to serve the interests of his employer.

515 P.3d 818, 825 (Mont. 2022).

79.  According to L.B., the United States is vicariously liable as Officer

Bullcoming's employer under the FTCA because his tortious conduct was

predicated upon and incident to his employment as a BIA officer.  On the other

hand, the government argues that the United States is not liable under the FTCA

because Officer Bullcoming's tortious conduct was outside the scope of his

employment as it was a departure from conduct authorized by the BIA.

80.  At the heart of this case is the reality that, although contrary to official

policy, law enforcement officers do sexually assault members of the public while

on the job.  The Montana Supreme Court addressed this issue when it explained

that "[u]ndisputedly, governments do not authorize their police officers to sexually

assault people when performing . . . authorized acts," but nonetheless determined

that the "[c]haracterization of [a law enforcement officer's] act as unauthorized

does not necessarily place an officer's sexual assault outside the sphere of employee actions for which the employer may be liable." *L.B.*, 515 P.3d at 822.

81. With its waiver of sovereign immunity, the FTCA allows the United States to be sued as a private person would be. *See* 28 U.S.C. § 1346. In the private context, policies against sexual harassment and sexual assault, even when accompanied by a threat of termination, do not always stop employees from sexually harassing or assaulting their coworkers. This case demonstrates that it is no different in the context of law enforcement. Despite official policies to the contrary, some law enforcement officers still sexually assault members of the public.

82. This case also shines a light on the realities of being a Native American woman living on a reservation policed by the BIA. In general, "there is systemic misconduct within the BIA and violence against Native American women on reservations." *See L.B.*, 515 P.3d at 826. Indeed, Native American "women are 2.5 times more likely to be raped or sexually assaulted than women in the United States in general." *Id.* (citing *United States v. Bryant*, 579 U.S. 140, 144 (2016)).

## I.  First Prong: Conduct Arose out of the Employment

83. For an employee's wrongful conduct to arise out of his or her employment, the wrongful conduct must be "similar or incidental to the conduct authorized" by the employer. *L.B.*, 515 P.3d at 824.

23

84. "[A]n act may be incidental to an authorized act, although considered separately it is an entirely different kind of act. Thus, the fact that an employer had no reason to expect the employee to perform the act is not conclusive." *L.B.*, 515 P.3d at 822 (internal quotation marks and citations omitted). Accordingly, "[c]haracterization of the act as unauthorized does not necessarily place an officer's sexual assault outside the sphere of employee actions for which the employer may be liable" because "[w]hen tortious acts are so closely associated with the employment that they arose out of and were committed during the furtherance of a task the employee was performing for his employer, they are within the scope of employment, making the employer liable." *Id.* at 822–23.

85. The relevant inquiry is therefore "how the employment relates to the context in which the commission of the wrongful act arose[,]" and "the nature of the employment itself." *Id.* at 824. Here, the question is whether the sexual assault of L.B. was "so disconnected from [Officer Bullcoming's] employment activities that a trier of fact could not find that his wrongful conduct arose out of and was committed in furtherance of [his] criminal investigation." *Id.* at 825. In *L.B.*, based on the certified facts, the Montana Supreme Court held "that Officer Bullcoming's wrongful conduct was not so disconnected from his employment." *Id.*

24

86.   Action that "represents a departure from, not an escalation of" authorized

conduct constitutes an "independent course of conduct" and is not incidental to

authorized actions.  Restatement (Third) of Agency § 7.07 cmt. b.

87.   The authorized act here was a criminal investigation, which includes the

use of authorized policing powers such as invasive physical contact and discretion.

The unauthorized act was the sexual assault of L.B.,[2] which this Court determined

constitutes false imprisonment and unlawful battery under Montana law.  (Doc. 85

at 9 (citing *Hughes v. Pullman*, 36 P.3d 339, 343 (Mont. 2001); *Point Serv. Corp.

v. Myers*, 125 P.3d 1107, 1112–13 (Mont. 2005)); Doc. 88.)

88.   To aid in determination of "whether conduct, although not authorized, may

be similar or incidental to the conduct authorized," the Montana Supreme Court

adopted the Restatement (Second) of Agency § 229 factors ("§ 229 factors").  *L.B.*,

515 P.3d at 824.  "While no factor is dispositive, each factor requires an inquiry

---

[2] The Montana Supreme Court stated that "[t]he unauthorized 'act' Officer
Bullcoming committed and for which he subsequently pleaded guilty was a
violation of 18 U.S.C. § 242; that is, 'under color of [] law, statute, ordinance,
regulation, or custom, [Officer Bullcoming] willfully subject[ed] [L.B] . . . to the
deprivation of [her] rights," *L.B.*, 515 P.3d at 824, specifically her "right not to be
deprived of liberty without due process of law," (Ex. 110 at 2).  In its default
judgment against Officer Bullcoming, this Court determined the tortious conduct
of Officer Bullcoming constituted false imprisonment and unlawful battery under
Montana law.  (Doc. 85 at 9; *see* Doc. 88.)  State-law torts are cognizable under the
FTCA, while constitutional torts are not.  *See* 28 U.S.C. § 1346(b)(1). The Court
uses "sexual assault" herein to describe the factual events that took place, which
constitute false imprisonment and unlawful battery under Montana law.

into how the employment relates to the context in which the commission of the wrongful act arose." *Id.* The § 229 factors are:

> (a) whether or not the act is one commonly done by such servants;
>
> (b) the time, place and purpose of the act;
>
> (c) the previous relations between the master and the servant;
>
> (d) the extent to which the business of the master is apportioned between different servants;
>
> (e) whether the act is outside the enterprise of the master or, if within the enterprise, has not been entrusted to any servant;
>
> (f) whether or not the master has reason to expect that such an act will be done;
>
> (g) the similarity in quality of the act done to the act authorized;
>
> (h) whether or not the instrumentality by which the harm is done has been furnished by the master to the servant;
>
> (i) the extent of departure from the normal method of accomplishing an authorized result; and
>
> (j) whether or not the act is seriously criminal.

*Id.*

89.    L.B. argues that the sexual assault was similar or incidental to the conduct authorized by the BIA, while the government argues that the sexual assault was a departure from the conduct authorized by the BIA. Ultimately, L.B. is correct.

### a. Factors

`

### i.  Factor (a): whether or not the act is one commonly done by such servants

90.   Regarding factor (a), the definition of common is crucial, but not defined by the Restatement (Second) of Agency.  The term is also not defined by Black's Law Dictionary or Gardner's Dictionary of Legal Usage outside of the property law context.  Merriam-Webster defines "common" in two relevant ways.  First, "common" can mean "belonging to or shared by two or more individuals." *Merriam-Webster* (11th ed. 2019).  Second, "common" can mean "occurring or appearing frequently." *Id.*

91.   Using the former definition, the testimony and evidence presented at trial shows that sexual assault "belong[s] to or [is] shared by two or more" law enforcement officers that police reservations. *See id.*  Officer Bullcoming's sexual assault of L.B. was not an isolated incident of sexual assault despite BIA policies to the contrary.  (Teeling; Ex. 109 at (citing *United States v. Connelly*, 613 Fed. Appx. 604, 605 (9th Cir. 2015) (unpublished)); *see* Nioce; Ex. 101 at 2.)  The government presented evidence that sexual assault is prohibited by BIA policy. (Nioce.)  In fact, the BIA Handbook states that "any personnel found guilty of sexual misconduct will be severely disciplined, to include termination of employment, and prosecuted to the full extent of the law."  (Ex. 200 at § 1-03). Nonetheless, the evidence shows that some officers policing reservations have committed sexual assaults.  In its sentencing memorandum for Officer

Bullcoming's criminal proceeding, (Ex. 109 at 7), the government cited to a case in which the U.S. Court for the District of Montana sentenced a former tribal police officer on the Blackfeet Reservation based on his conduct of forcing a woman to perform oral sex on him to avoid going to jail. *Connelly*, 613 Fed. Appx. at 605. The BIA is aware that between 2015 and 2018 there were four allegations of sexual assault committed by BIA officers on the Northern Cheyenne Reservation, which includes L.B.'s allegation against Officer Bullcoming. (Ex. 101 at 2.) Nioce testified that she is aware of at least two allegations of sexual assault by BIA officers on the Northern Cheyenne Reservation after Officer Bullcoming's sexual assault of L.B. (Nioce.) However, Nioce did not characterize the allegations of which she is aware as meaning that sexual assault commonly occurs among BIA officers. (Nioce.) Teeling also testified to an additional instance of sexual assault committed by a BIA officer. (Teeling.) Thus, under the former definition, the act of sexual assault is common here.

92.   However, using the second definition, the frequency of sexual assault committed by BIA officers or law enforcement officers in general was not directly presented at trial. Teeling testified that he has worked numerous rape cases where the assault was committed by law enforcement officers and would characterize this conduct as a pattern. (Teeling.) In the sentencing memorandum that the United States filed in the criminal proceeding against Officer Bullcoming, the government

affirmatively argued that "Bullcoming is not the first former police officer to get sentenced for deprivation of rights under color of law in the Ninth Circuit," and proffered three then-contemporary cases in which law enforcement officers sexually assaulted women. (Ex. 109 at 7.) Thus, the evidence shows sexual assault does occur in this context, but not that it occurs "frequently," as provided by the latter definition.

93.    Accordingly, this factor is neutral as to whether Officer Bullcoming was acting within the course and scope of his employment when he sexually assaulted L.B.

### ii.    Factor (b): the time, place and purpose of the act

94.    Regarding factor (b), the testimony and evidence presented at trial shows that the sexual assault occurred while Officer Bullcoming was on duty and patrolling alone as authorized by the BIA. (Agreed ¶ 1; Nioce.)  He arrived to L.B.'s residence as part of a criminal investigation, (Agreed ¶ 3), meaning he was only there by virtue of his employment.  Officer Bullcoming drove his patrol car to L.B.'s residence. (L.B.; *see* Agreed ¶ 6.)  He was in uniform, wearing his badge and gun. (L.B.)  The patrol car, uniform, badge, and gun are "visible signs of [] employer-conferred authority" that "officers use to carry out their employment duties." *L.B.*, 515 P.3d at 825.  During their interactions, L.B. testified that she felt she had to do what Officer Bullcoming said because he was a police officer. (L.B.)

29

Such a feeling of required compliance with law enforcement arises from the "considerable and intimidating powers" that officers possess, including "subjecting [members of the public] to forceful, nonconsensual, and offensive contact." *See L.B.*, 515 P.3d at 825.

95.    After observing the possible criminal activity of alcohol consumption on a dry reservation, Officer Bullcoming administered a breathalyzer test. (Agreed ¶ 6.) L.B.'s results were .132 or .136. (Agreed ¶ 6.) Consuming alcohol is a crime on the Northern Cheyenne Reservation, (Agreed ¶ 10), meaning the breathalyzer results in conjunction with the beer cans in her residence, (Agreed ¶ 4), and her own admission to drinking, (L.B.), confirmed to Officer Bullcoming that L.B. had violated the law. Officer Bullcoming was authorized to exercise his discretion whether to charge or not charge this crime. (Nioce.) Nioce testified that officers are only authorized to use their discretion within the bounds of the law, and that an officer trading leniency for sex is not a reasonable exercise of discretion pursuant to the BIA code of conduct. (Nioce.)

96.    Despite BIA policy, Officer Bullcoming chose to exercise his discretion by repeatedly telling L.B., "something needs to be done." (Agreed ¶ 7; L.B.) The Montana Supreme Court aptly observed that "[i]t is unlikely that the statement 'something had to be done' uttered by anyone without law enforcement [] authority

would have the same coercive weight and connotations as when Officer Bullcoming uttered those words, repeatedly, to L.B." *L.B.*, 515 P.3d at 827.

97.   Accordingly, this factor weighs in favor of finding that Officer Bullcoming was acting within the course and scope of his employment when he sexually assaulted L.B.

### iii.   Factor (c): the previous relations between the master and the servant

98.   Regarding factor (c), Officer Bullcoming was a longtime BIA law enforcement officer who was in good standing at the time of the sexual assault.  He was routinely tasked with enforcing the law and investigating potential crimes by the BIA.  (Nioce; Wind.)

99.   The BIA conducted a thorough background check of Officer Bullcoming.  (Wind.)  The BIA did not receive any community complaints regarding Officer Bullcoming.  (Wind.)  He also consistently scored satisfactory or above on his annual performance reviews.  (Wind.)  The only criticism his supervisor or coworker testified to was his failure to generate reports.  (Wind.; Tsosie.)

100.   Accordingly, this factor weighs in favor of finding that Officer Bullcoming was acting outside the course and scope of his employment when he sexually assaulted L.B.

### iv.   Factor (d): the extent to which the business of the master is apportioned between different servants

101. Factor (d) does not bear on the facts of this case because it pertains to how an employer apportions different job responsibilities to different employees. This case does not involve any distinctions between the job responsibilities of different types of employees. *See* § 229 cmt. a, illus. 2. Accordingly, this factor is neutral.

> **v.  Factor (e): whether the act is outside the enterprise of the master or, if within the enterprise, has not been entrusted to any servant**

102. Regarding factor (e), invasive physical contact and discretion are within the enterprise of BIA policing and entrusted to BIA officers.

103. The testimony and evidence presented at trial shows that BIA law enforcement officers have authority conferred by the United States as their employer to detain, arrest, frisk, search, seize, and use deadly force if necessary. (Nioce.) The job duties of these officers include initiating nonconsensual, and at times, invasive physical contact with members of the public pursuant to law enforcement goals. (Nioce.) Nioce testified that BIA law enforcement officers may have to exert physical force over someone they are investigating, and that such force can be unauthorized. (Nioce.)

104. In *L.B.*, the Montana Supreme Court determined that "the scope of a police officer's employment contemplates physical contact, whether wrongfully or appropriately exercised." *L.B.*, 515 P.3d at 825.

32

105.    The evidence also shows that BIA officers are given significant discretion regarding whether to charge crimes. (Nioce); *see L.B.*, 515 P.3d at 825 ("Officers have significant police discretion to enforce certain laws and to let civilians off with a warning.") This power includes the discretion to charge or not charge the crime of consuming alcohol on the Northern Cheyenne Reservation. (Nioce.)

106.    Special Agent in Charge Nioce testified that an officer's sexual assault of a person he or she is investigating never serves the BIA's mission or function, and that BIA policies expressly forbid such conduct. (Nioce; Ex. 200 at § 1-03.) But, as made clear by the Montana Supreme Court in *L.B.*, the fact an act itself is not authorized "does not necessarily place an officer's sexual assault outside the sphere of employee actions for which the employer may be liable." 515 P.3d at 822. Indeed, "acts which are illegal, unauthorized, or disobedient could still result in the employer's vicarious liability." *Id.* (citing *Kornec v. Mike Horse Mining & Milling Co.*, 180 P.2d 252, 256 (Mont. 1947)). Accordingly, Special Agent in Charge Nioce's testimony and the BIA Handbook's prohibition of sexual assault does not necessarily render the sexual assault outside the enterprise of BIA policing. If the sexual assault is "so closely associated with the employment" then it can be "within the scope of employment." *Id.* at 823.

107.    Here, Officer Bullcoming's ability to engage in invasive physical contact and exercise discretion was within the enterprise of BIA policing. His decision to

exercise such powers in a criminal way does not remove these powers from what is entrusted to employees during the enterprise of policing.

108.    Accordingly, this factor weighs in favor of finding that Officer Bullcoming was acting within the course and scope of his employment when he sexually assaulted L.B.

> **vi.    Factor (f): whether or not the master has reason to expect that such an act will be done**

109.    Regarding factor (f), and as is discussed above in regard to factor (c), the evidence presented at trial shows that Officer Bullcoming was a longtime BIA law enforcement officer who was in good standing at the time of the sexual assault. (Wind; Tsosie.)  After supervising Officer Bullcoming, Senior Special Agent Wind testified that he did not have any reason to expect Officer Bullcoming would sexually assault anyone.  (Wind.)  Similarly, after regularly working with Officer Bullcoming, Assistant Special Agent in Charge Tsosie testified he also did not have any such expectation. (Tsosie.)

110.    However, neither Senior Special Agent Wind nor Assistant Special Agent in Charge Tsosie was aware that Officer Bullcoming had sex with women while on duty.  (Wind; Tsosie; *see* Ex. 105 at 12; Ex. 106 at 3; Fullerton.)  Regardless of whether this number of women was three, twelve, or twenty, Officer Bullcoming's supervisors were unaware of this conduct.  Special Agent in Charge Nioce testified

that Officer Bullcoming's engagement in consensual sexual conduct while on duty did not make his sexual assault more likely. (Nioce.)

111. As discussed in regard to factor (a), the evidence presented at trial shows there is a pattern of sexual assault committed by law enforcement officers, (Teeling; Ex. 109 at 7), and that Officer Bullcoming's sexual assault of L.B. was not an isolated incident, (Teeling; Nioce; Ex. 101 at 2). While such a pattern could have put the BIA on notice that sexual assault was generally possible, on balance, the evidence shows that the BIA did not have reason to expect that Officer Bullcoming, specifically, would commit sexual assault while on duty, particularly because his supervisor and coworker were unaware that he was having sex on duty.

112. Accordingly, this factor weighs in favor of finding that Officer Bullcoming was acting outside the course and scope of his employment when he sexually assaulted L.B.

### vii.    Factor (g): the similarity in quality of the act done to the act authorized

113. Regarding factors (g), invasive physical contact and discretion are actions that BIA officers are authorized to engage in during a criminal investigation. The evidence presented at trial shows that the quality of the sexual assault committed by Officer Bullcoming is not dissimilar to these authorized acts.

114. As discussed above in factor (e), the United States confers BIA law enforcement officers with the authority to engage in invasive physical contact with

`

members of the public and exercise significant discretion regarding whether to

charge crimes.  (Nioce); *L.B.*, 515 P.3d at 824–25.  However, BIA policy expressly

prohibits sexual assault.  (Nioce; Ex. 200 at § 1-03.)

115.   At trial, the government argued that given BIA policy, Officer

Bullcoming's tortious act of sexual assault "represents a departure from, not an

escalation of," the conduct involved in performing BIA authorized acts, and is

therefore not incidental to authorized actions.  The government further argued that

this is a key distinction between cases involving excessive use of force in pursuit

of a law enforcement purpose, and sexual assaults that bear no similarity to any

authorized conduct.  The former being an escalation and the latter being a

departure.

116.   However, as argued by L.B., based on the specific facts of this case, the

sexual assault was an escalation of, not a departure from, authorized BIA conduct.

The Restatement (Third) Agency explains that "[a]n independent course of conduct

represents a departure from, not escalation of, [authorized] conduct."  Restatement

(Third) of Agency § 7.07 cmt. b.  Here, Officer Bullcoming's tortious conduct was

not an independent course of conduct from the criminal investigation he was

conducting.

117.   Officer Bullcoming arrived at L.B.'s residence pursuant to an authorized

investigation, (Agreed ¶¶ 2, 3; Nioce; Ex. 108 at 7), with his patrol car, uniform,

badge, and gun, which are all "visible signs of [] employer-conferred authority"
that "officers use to carry out their employment duties," *L.B.*, 515 P.3d at 825.
Once inside, he observed the possible criminal activity of consuming alcohol on a
dry reservation. (Agreed ¶ 4.) He then began to investigate this crime by speaking
with L.B. and administering a breathalyzer test. (Agreed ¶ 6.) Once the results
displayed .132 or .136, (Agreed ¶ 6), together with the beer cans in her residence,
(Agreed ¶ 4), and her own admission to drinking, (L.B.), Officer Bullcoming was
aware that L.B. had violated the law. Officer Bullcoming then utilized his
authority to exercise discretion when he chose to present L.B. with the choice of
sex or arrest. He then utilized his authority to engage in invasive physical contact
when he vaginally penetrated her. The acts which comprise the sexual assault are
not independent from his criminal investigation; instead, they stem directly from
that very course of action.

118.   Accordingly, this factor weighs in favor of finding that Officer
Bullcoming was acting within the course and scope of his employment when he
sexually assaulted L.B.

> ### viii.   Factor (h): whether or not the instrumentality by which the harm is done has been furnished by the master to the servant

119.   Regarding factor (h), the United States furnished Officer Bullcoming
with both the power and the opportunity to sexually assault L.B.

120.   As is discussed above regarding factors (e) and (g), BIA law enforcement officers have authority conferred by the United States to engage in invasive physical contact with members of the public and exercise significant discretion regarding whether to charge crimes. (Nioce); *see L.B.*, 515 P.3d at 824–25. However, sexual assault is strictly prohibited by the BIA under threat of prosecution and termination of employment. (Ex. 200 at § 1-03-01; Nioce.) Despite policies to the contrary, the United States furnished Officer Bullcoming with the power to sexually assault L.B.

121.   The opportunity for this sexual assault was also furnished by the United States. At the time of the assault, Officer Bullcoming was in L.B.'s home only by virtue of his status as a BIA officer. (Nioce; Ex. 108 at 7); *see L.B.*, 515 P.3d at 827. He was alone, as BIA law enforcement officers often are when patrolling the Northern Cheyenne Reservation. (Nioce.) He was also not wearing a body camera as the BIA did not require its officers to wear body cameras in 2015. (Nioce.) Further, "it is unlikely that the statement 'something had to be done' uttered by anyone without law enforcement or similar authority would have the same coercive weight and connotations as when Officer Bullcoming uttered those words, repeatedly, to L.B." *L.B.*, 515 P.3d at 827.

122.   Accordingly, this factor weighs in favor of finding that Officer

Bullcoming was acting within the course and scope of his employment when he

sexually assaulted L.B.

ix.   **Factor (i): the extent of departure from the normal
method of accomplishing an authorized result**

123.   Regarding factor (i), the definition of normal is critical, but not defined

by the Restatement (Second) of Agency.  Black's Law Dictionary defines

"normal" in two relevant ways.  First, "normal" can mean "not deviating from an

established standard, rule, principle." *Black's Law Dictionary* (12th ed. 2024).

Second, "normal" can mean "[a]ccording to a regular pattern" describing "not just

forces that are constantly and habitually operating but also forces that operate

periodically or with some degree of frequency." *Id.*

124.   Using the former definition, the normal method of pursuing a criminal

investigation does not involve sexual assault.  At trial, the government repeatedly

presented evidence that shows established BIA standards prohibit sexual

misconduct, (*e.g.*, Ex. 200 at § 1-03-01), and Special Agent in Charge Nioce

testified that sexual assault is never an acceptable component of an investigation or

means of accomplishing an investigation, (Nioce).

125.   However, using the latter definition, evidence presented at trial also

shows that a pattern of sexual assault committed by law enforcement officers

exists, and that Officer Bullcoming's sexual assault of L.B. was not an isolated

incident of such assault, as discussed above regarding factor (a). Both sexual

assault by law enforcement officers in general, and by BIA officers specifically,

can be said to occur "according to a regular pattern" as "forces that operate

periodically." *See Normal, Black's Law Dictionary* (12th ed. 2024).

126.    "[E]ach factor requires an inquiry into how the employment relates to the

context in which the commission of the wrongful act arose," as well as "the nature

of the employment itself." *L.B.*, 515 P.3d at 824. Determining such context and

nature requires an evaluation of how employment is actually conducted, not how it

would ideally be conducted pursuant to policy. Thus, the actual conduct of some

officers carries more weight than the policy standards prohibiting this conduct.

127.    Accordingly, this factor weighs in favor of finding that Officer

Bullcoming was acting within the course and scope of his employment when he

sexually assaulted L.B.

### x.    Factor (j): whether or not the act is seriously criminal

128.    Regarding factor (j), Bullcoming's sexual assault of L.B. was seriously

criminal in nature, as evidenced by his indictment, (Doc. 110), guilty plea, (Doc.

104), and sentence to custody for the assault, (Doc. 115). "The fact that the act

done is a serious crime is a factor indicating that it is not in the scope of

employment." Restatement (Second) of Agency § 229 cmt. f. Accordingly, this

factor weighs in favor of finding that Officer Bullcoming was acting outside the course and scope of his employment when he sexually assaulted L.B.

### b. Conclusion

129.   Considering the § 229 factors, the testimony and evidence presented at trial establish that Officer Bullcoming's sexual assault of L.B. was similar or incidental to the conduct authorized by his employment, as the nature of Officer Bullcoming's employment as a BIA law enforcement officer directly related to the context in which the commission of the sexual assault arose. *See L.B.*, 515 P.3d at 824.

130.   Accordingly, Officer Bullcoming's sexual assault of L.B. arose out of his employment with the BIA.

## II.   Second Prong: Mixed Motive

131.   The course-and-scope test established by the Montana Supreme Court also involves an assessment of whether the officer was "at least partially motivated by the employee's intent or purpose to serve the employer's interest." *L.B.*, 515 P.3d at 822, 825.  Thus, liability may attach when "an employee [] act[s] with a mixed motive." *Id.*

132.   "Even if the employee's act is unauthorized and, the wrongful act *by itself*, is not motivated by any intent or purpose to serve the employer, an employee's tortious act may still be incidental to expressly or implicitly authorized

conduct if it is 'closely intermingled' with the employment." *Id.* at 823 (quoting

*Keller v. Safeway Stores*, 108 P.2d 605, 612 (Mont. 1940))

133.   Crucial here is that "whether the employee was acting at least partially in

furtherance of the employer's interest does not depend on whether the employer

actually profited or benefitted from the act." *Brenden v. City of Billings*, 470 P.3d

168, 174 (Mont. 2020).  Instead, "[t]he state of mind of the employee is

determinative." *Id.* at 175.

134.   "The question of whether an employee was at least partially motivated by

an intent or purpose to directly or indirectly further the employer's interest is a

question of fact for consideration under the totality of the circumstances." *Id.*

135.   Here, Officer Bullcoming's testimony regarding his motive is

inconsistent and unreliable as explained above.

136.   Although Officer Bullcoming had a longstanding romantic interest in

L.B., (Ex. 105 at 5; L.B.), and Officer Bullcoming testified that his motive for the

sexual assault was personal, (Ex. 105 at 4–5), the mixed-motive prong allows

liability to attach if he was "at least partially motivated to serve" the BIA's

"interest to some extent." *See Brenden*, 470 P.3d at 175 (internal quotation marks

omitted); *L.B.*, 515 P.3d at 825 (explaining that even "if some of Officer

Bullcoming's motive was self-interest, he was there to investigate the interests of

42

his employer—acting as an officer and agent of the BIA investigating a crime—

when he used his employer-conferred powers to sexually assault L.B.").

137.   When Officer Bullcoming arrived at L.B.'s residence, he was conducting

an authorized investigation and he was in uniform wearing both his badge and gun,

and driving his official patrol car.  (L.B.; *see* Agreed ¶¶ 3, 6.)  As discussed above,

Officer Bullcoming possessed the authorized ability to engage in invasive physical

contact and exercise discretion regarding whether to charge or not charge a crime.

(Nioce).  After identifying the possible crime of consuming alcohol on a dry

reservation, he conducted a breathalyzer test.  (Agreed ¶ 6.)  L.B. testified that

during this interaction she felt like she had to do what Officer Bullcoming said

because he was a police officer.  (L.B.)  The breathalyzer result indicated

intoxication.  (Agreed ¶ 6.)  At this point, Officer Bullcoming had the authorized

ability to exercise discretion regarding whether to charge or not charge this crime.

(Nioce.)  He used this discretion to present L.B. with a choice of sex or arrest.

(L.B.; Agreed ¶ 7.)

138.   This evidence presented at trial shows that Officer Bullcoming's sexual

assault of L.B. was closely intermingled with his employment.  As is discussed

above, not only was Officer Bullcoming at L.B.'s residence solely by virtue of his

employment as a BIA law enforcement officer, but his statement "something has to

be done," which he repeated multiple times, (Agreed  ¶ 7; L.B), would not likely

have carried "the same coercive weight and connotations" if uttered by someone "without law enforcement [] authority," *L.B.*, 515 P.3d at 827. Further, while conducting an authorized criminal investigation, Officer Bullcoming possessed the policing power to exercise significant discretion regarding whether to charge a crime. (Nioce.) He chose to use that discretion in a criminal and wrongful way.

139.   Special Agent in Charge Nioce testified that an officer's sexual assault does not benefit the employer and is, instead, simply an act of personal self-gratification. (Nioce.) However, in *L.B.*, the Montana Supreme Court clearly stated that "whether the employee was acting at least partially in furtherance of the employer's interest does not depend on whether the employer actually profited or benefitted from the act." 515 P.3d at 823 (citing *Brenden*, 470 P.3d at 174). Thus, a lack of direct benefit to the BIA does not negate the evidence that the sexual assault was closely intermingled with Officer Bullcoming's employment.

140.   Accordingly, under the totality of the circumstances, the record shows that Officer Bullcoming was at least partially motivated by an intent or purpose to serve the BIA's interest because his tortious act was closely intermingled with his employment. *See L.B.*, 515 P.3d at 823.

CONCLUSION

Based on the above, Officer Bullcoming was acting in the course and scope of his employment when he sexually assaulted L.B.  Accordingly, the United States is liable for Officer Bullcoming's tortious conduct pursuant to the FTCA. Having stipulated to the damages amount of $1,611,854.00, (Doc. 173), this amount is awarded to L.B.   Accordingly, IT IS ORDERED that:

(1)    Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the Court finds in favor of L.B. as to her FTCA claim against the United States and the Bureau of Indian Affairs.

(2)    Damages are awarded to L.B. in the amount of $1,611,854.00.

(3)    The Clerk is directed to enter judgment under Rule 58 of the Federal Rules of Civil Procedure in favor of L.B. and against the United States and the Bureau of Indian Affairs.

(4)    L.B. is entitled to costs of suit as authorized by law.

DATED this 25 day of February, 2025.

Donald W. Molloy, District Judge
United States District Court